UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIM. NO. 2:20-CR-39-DBH-01 |
| | ) | |
| GILBERT PEREZ, | ) | |
| | ) | |
| DEFENDANT | ) | |

## DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

In this drug trafficking prosecution, the defendant Gilbert Perez has moved to suppress all the evidence resulting from his encounter with Massachusetts State Police on August 30, 2019. After a testimonial hearing on June 17, 2021, and later briefing on the motion, these are my findings of fact and conclusions of law. Only the troopers testified at the hearing, not the defendant. There are no disputed facts, only minor inconsistencies in the descriptions of what occurred.

### FINDINGS OF FACT

**1.** On the summer evening of Friday, August 30, 2019, around 6:00 p.m. it was still light in Lawrence, Massachusetts. Members of the Massachusetts State Police North Shore Gang Task Force were doing a routine patrol in the area bordering Methuen. They had no target and no particular information. They were simply looking to interdict any drug or gang related information they came across.

**2.** What they did have was their knowledge gained from experience: that Lawrence was a hub for drug distribution into northern New England, including Maine and New Hampshire; that the area they were patrolling was frequently the location of drug deals and was very close to I-495, an interstate route to those states; and that drug deals there often took place in taxis so that law enforcement could not see them and could not track the registration of the participants' vehicles.[1]

**3.** Around 6:10 p.m., Sergeant Jason Conant saw a dark-colored pickup truck with Maine license plates pull into a McDonald's parking lot. He learned by computer that the truck was registered to someone who lived in Acton, Maine, about 1-1/2 hours away. The driver was a white male; the passenger female.

**4.** Sergeant Conant saw the driver get out of the truck while wearing a distinctive blaze orange cap, don a backpack, and walk around the rear of the truck to talk to the passenger through the passenger window. Then the driver proceeded to walk, not into McDonald's, but away from the restaurant to a nearby bordering residential area. As he walked, he was talking on his cellphone.

**5.** Sergeant Conant radioed this information to the other two members of his unit but soon lost sight of the male with the blaze orange hat.

**6.** Within 3 to 5 minutes, Trooper Shawn McIntyre saw the white male with the blaze orange hat getting out of a taxi on Montgomery Street a couple of blocks away which, given the location and the time, he believed reflected a ride

---

[1] The evidence was that law enforcement had all this information, not that the defendant had it.

of less than a block. The male was headed back toward the truck. McIntyre radioed that information to his colleagues and Sergeant Conant instructed him to stop the cab and investigate further. McIntyre did so.

**7.** Trooper McIntyre saw large quantities of cash, appearing to be in the thousands of dollars, on the floor of the cab in front of a passenger. The passenger denied the cash belonged to him. The cab driver told McIntyre the man in the blaze orange cap had flagged him down. Trooper McIntyre communicated all this information to his colleagues and instructed Trooper Ryan Dolan to go to Sergeant Conant to assist him because he was concerned that a large amount of drugs had been exchanged for the large amount of cash.

**8.** Soon Sergeant Conant saw the man in the blaze orange cap returning to the vicinity of his truck. Given the location, the Maine-registered vehicle, the driver's behavior, the use of the cellphone, the use of the cab, and the large quantity of cash in the cab of which the passenger denied knowledge, Sergeant Conant believed a drug deal had just occurred.

**9.** Sergeant Conant pulled his vehicle into a parking lot parking spot as the man in the blaze orange cap crossed the front of the vehicle, and the Sergeant got out. Although he was in plain clothes, he had a police identification medallion around his neck. As soon as Sergeant Conant got out of his vehicle, the man in the blaze orange cap started to run away even as Sergeant Conant was yelling "state police."[2]

---

[2] There is no evidence about what the defendant perceived or thought, just what Sergeant Conant did.

**10.** After about twenty yards the man in the blaze orange cap tripped and fell to the ground, and his cellphone skittered away. Sergeant Conant ran up to him and held him on the ground, face down, with one hand on the backpack and one hand on the man's shoulder. Trooper Dolan pulled up, got out of his vehicle and, as Sergeant Conant ripped the backpack off the man, Dolan handcuffed him behind his back, then sat him up on the pavement.

**11.** Sergeant Conant began to open the backpack on the hood or roof of Dolan's vehicle and, as he did so, the man told him "the stuff's not his, the stuff in the bag isn't his, he was kind of forced to come down and—and pick it up." No one was questioning him at the time. The man was not within reaching distance of the backpack.

**12.** Sergeant Conant discovered a quantity of illegal drugs (fentanyl and cocaine) in the backpack.

**13.** Eight or nine minutes had transpired from the time Sergeant Conant lost sight of the man until he apprehended him.

**14.** Law enforcement also searched the man. The parties stipulated that law enforcement discovered and seized currency and a cellphone as a result. Stipulation (ECF No. 125). They also seized the cellphone that the man had dropped earlier. Id.

**15.** Trooper Dolan saw the female passenger leave the Maine truck and he followed her into McDonald's. He persuaded her to exit the restaurant and brought her over to where the man was handcuffed.

**16.** Dolan then administered Miranda warnings to both of them. The man continued to talk, without being asked a question, saying in substance he

was made to do it and was just going to pick something up for a friend, whom he named, and that the friend was the one they really wanted. The woman warned him to stop talking until he had a lawyer.

**17.** The troopers then formally arrested the man, but not the woman. The man turned out to be Gilbert Perez, the defendant. The police proceeded to search the truck. The parties stipulated that they discovered and seized currency in the truck. (ECF No. 125).

**18.** The officers had no particular reason to believe that Perez was armed, only their general knowledge that drug transactions were often accompanied by weapons.

**19.** There was no evidence regarding the female passenger's right, ability, or intent to drive the Maine-registered truck.

## CONCLUSIONS OF LAW

### A. *Probable Cause for the Arrest*

The police had probable cause to arrest Perez when they handcuffed him, and I treat them as having effectively arrested him then. Perez had arrived in a Maine-registered truck in an area where drug trafficking occurred, close to I-495 and access to Maine. He parked his Maine truck next to a McDonald's but did not go in, instead donning a backpack and walking away while talking on his cellphone. He quickly got into and out of a taxicab nearby, a cab he had flagged down. After he left the cab, a large quantity of cash was seen on the floor, of which the passenger claimed no knowledge. Perez was then seen returning to the Maine truck. When Sergeant Conant, wearing his police medallion, got out of his vehicle, Perez immediately started to run even as Conant yelled "state

5

police." Under the circumstances, the police could reasonably conclude that Perez had just engaged in an illegal transaction.[3]

According to the First Circuit: "[P]robable cause exists where 'police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect committed or was committing a crime.' It does not require law enforcement officers to have 'an ironclad case . . . on the proverbial silver platter.' Instead, '[i]t suffices if . . . a prudent law enforcement officer would reasonably conclude that the likelihood existed that criminal activities were afoot, and that a particular suspect was probably engaged in them.'" United States v. Centeno-González, 989 F.3d 36, 45 (1st Cir. 2021) (citations omitted). That is the case here. Are there other possible explanations? Perhaps for individual items, like the decision to park at McDonald's without going inside, walking while talking on a cellphone, wearing a backpack. Possibly there could have been another white male with a blaze orange hat (the troopers saw only the one) and possibly the cab the police stopped was not the cab that Perez exited. But when all the factors are combined, including Perez's very brief cab ride and the presence of a large amount of cash on the cab floor, the conclusion of an illegal transaction is irresistible.

I therefore do not address whether there were grounds for a *Terry* stop before the handcuffing. I treat the handcuffing as a de facto arrest.

---

[3] I emphasize that the issue is what information the troopers had, not what the defendant was thinking when he ran; there is no evidence about the latter.

### B. *Search of Perez's Backpack*

The search of Perez's backpack without a warrant is the critical issue in the case. Perez's backpack is where the illegal drugs were found.

The First Circuit ruled on this issue of whether a warrant is required to search a container found on a person being arrested in United States v. Eatherton, 519 F.2d 603 (1st Cir. 1975). In that case, law enforcement opened, without a warrant, a briefcase the defendant had been carrying, but not until after they had handcuffed the defendant and placed him in the police car. The defendant argued that although there was probable cause to arrest him, a warrant was required to examine the briefcase's contents. The court agreed that the defendant's argument had "some logical cogency," 519 F.2d at 610, but concluded that the Supreme Court decisions of Chimel, Robinson, Gustafson, and Edwards did not support requiring a warrant. Instead, probable cause for the arrest alone supported a warrantless search of his person and the property in his immediate possession, even after law enforcement had removed it from his immediate possession. Id. at 610-11.

Perez argues that in Arizona v. Gant, 556 U.S. 332 (2009), the Supreme Court changed the law on this issue so that now a warrant is generally required for a search of property once it is no longer under the defendant's control.[4] He says that the Third, Fourth, Seventh, Ninth, and Tenth Circuits and the District

---

[4] Gant said: "we . . . hold that the *Chimel* rationale authorizes police to search a vehicle incident to a recent occupant's arrest *only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search*" and that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" 566 U.S. 332, 343 (2009) (emphasis added).

7

of New Hampshire agree, applying Gant to non-vehicular containers. Def.'s Post-Hr'g Mem. at 18 & n.3; see United States v. Davis, 997 F.3d 191, 195-200 (4th Cir. 2021); United States v. Knapp, 917 F.3d 1161, 1168 (10th Cir. 2019); United States v. Hill, 818 F.3d 289, 295 (7th Cir. 2016); United States v. Cook, 808 F.3d 1195, 1199 n.1 (9th Cir. 2015); United States v. Shakir, 616 F.3d 315, 318 (3d Cir. 2010); United States v. Wilson, No. 18-cr-180-1-SM, 2019 U.S. Dist. LEXIS 212524, at *6-11 (D.N.H. Dec. 10, 2019).

The government says those courts "have erroneously interpreted *Gant* to mean that incidental searches of containers or items found on the person of the arrestee must be justified on a case-by-case basis by a specific need to prevent the destruction of evidence or the access to weapons at the time of the search." Gov't's Post Hr'g Br. at 19. Here, Perez was secured in handcuffs on the ground under Dolan's supervision as Conant was searching the backpack on the hood or roof of Dolan's vehicle, not within reaching distance of Perez, so destruction of evidence or access to weapons was not at stake. But the government maintains that other Circuits continue to allow warrantless searches of containers found on the arrestee's person as a categorical rule, id. at 23, and cites cases accordingly.

In any event, the First Circuit has not revisited its holding in Eatherton since Gant. In Carson v. Makin, 401 F. Supp. 3d 207, 211 (D. Me. 2019), I addressed "my role as a federal trial judge" in such circumstances:

> As a federal trial judge, I must follow any decision from the Court of Appeals for the First Circuit directly on point, except in limited circumstances: "Until a court of appeals *revokes* a binding precedent, a district court within the circuit is hard

8

> put to ignore that precedent unless it has *unmistakably been cast into disrepute* by supervening authority."

(quoting Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004)).

The First Circuit has not revoked Eatherton.[5] On the facts in this case, I might be inclined to follow the Third, Fourth, Seventh, Ninth, and Tenth Circuits and the District of New Hampshire in their interpretation of Gant as now requiring a warrant under the circumstances here, but I cannot say that Gant "unmistakably" cast Eatherton "into disrepute." That is for the First Circuit to decide. Given Eatherton, I conclude that the warrantless search of the backpack here was appropriate and its contents should not be suppressed.

The parties have stipulated that "the Court's determination of the lawfulness of the search of Defendant's backpack is dispositive" as to other seized items. "Defendant agrees that if the Court denies the motion to suppress with respect to the items found in Defendant's backpack, the above-referenced currency and cellular telephones should not be suppressed." (ECF No. 125).[6] I therefore do not address the legal issues associated with those seizures, but conclude simply that they should not be suppressed.

### C. Statements pre-*Miranda*

As Sergeant Conant ripped the backpack off Perez and before *Miranda* warnings had been given, Perez said the stuff's not his, the stuff in the bag isn't

---

[5] The defendant argues that the First Circuit has cited Eatherton with approval only once and that the case doing so was later abrogated. Def.'s Post-Hr'g Mem. at 16 (ECF No. 134). Those cases—United States v. Klein, 522 F.2d 296, 300 (1st Cir. 1975); Swain v. Spinney, 117 F.3d 1, 8 (1st Cir. 1997), had nothing to do with container searches, and do not undermine Eatherton's holding on that issue.

[6] Conversely, "the government agrees that if the Court grants the motion to suppress the items found in Defendant's backpack, the government will not seek to admit the above-referenced currency and cellular telephones in its case-in-chief." Stipulation (ECF No. 125).

9

his, he was kind of forced to come down and pick it up. These statements were not in response to any questions. Perez argues that they must be excluded as the product of the illegal search of the backpack. They do not qualify for exclusion because I have not found the backpack search illegal. In any event, they were not the product of questioning; they occurred before Conant uncovered what was in Perez's backpack and if Conant had stopped his search of the backpack at that time, Perez's statements were already uttered, so they were not fruit of the warrantless search. Perez seems to have been irrepressible in his utterances (see next section) and I find that once the police seized him, he was going to say these things regardless.

### D. Statements post-*Miranda*

After the *Miranda* warnings, Perez continued to talk without being questioned. He said in substance that he was made to do it, was just going to pick something up for a friend, whom he named, and that the friend was who the police really wanted. Perez argues that these statements are a product of the illegal backpack search. I disagree both because the backpack search was not illegal and because Perez knew he had been caught and, whether the backpack was searched then or later, he was going to explain. Even his female companion had to tell him to stop talking.

As a result, the defendant's motion to suppress is **DENIED**.

**SO ORDERED.**

**DATED THIS 14TH DAY OF JULY, 2021**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**